Filed 8/21/14  P. v. Medina CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NATHAN MEDINA,<br><br>        Defendant and Appellant. | A138496<br><br>(Contra Costa County<br>Super. Ct. No. 05-080656-2) |

Pursuant to Penal Code[1] section 1237, subdivision (b), defendant Nathan Medina appeals the trial court's postjudgment order of restitution in favor of victim Beverly Rhoads in the amount of $120,037.84.  As explained below, we shall affirm Beverly's award in part, reverse in part, and modify the restitution order accordingly.

## FACTS AND PROCEDURAL BACKGROUND

"Defendant Nathan Medina invaded the home of Beverly Rhoads, who was involved in civil litigation with defendant's mother and stepfather.  He assaulted [Beverly] with pepper spray, shot her son [Joshua] to death, tried to shoot her, and tried to shoot a family friend."  (*People v. Medina* (Feb. 24, 2012, A125850) [nonpub. opn.] at p. 1.)  A jury convicted defendant of the first degree murder of Joshua, the attempted murders of Beverly and her friend, and first degree residential burglary.  Further, the jury found that in committing each offense defendant personally used and personally discharged a firearm causing great bodily injury.  The trial court sentenced defendant to

_____

[1] All further unspecified statutory references are to the Penal Code unless otherwise noted.

1

25 years to life on the murder conviction, with a consecutive enhancement of 25 years to life for personal use of a firearm; life in prison with a consecutive 20 years for the firearm enhancement on each attempted murder conviction; and a concurrent term of four years for the burglary. We rejected defendant's contentions on appeal and affirmed the judgment. (*People v. Medina, supra,* A125850.)

On August 11, 2011, the court prepared and served "Notice to Defendant Regarding Restitution," enclosing a proposed order for restitution and abstract of judgment in the amount of $41,960.09, comprising $18,699.45 to compensate Clarence Rhoads III and $23,260.64 to reimburse the Victim's Compensation Board. On October 5, 2011, defendant's mother appeared and requested a hearing on the proposed restitution. The public defender was appointed to represent defendant and the matter was set for a restitution conference. At a subsequent restitution hearing, it appears the court ordered the restitution described above, as well as direct restitution in the amounts of $6,191.46 to Brandy Rhoads and $11,049.74 to Beverly Rhoads.[2]

At a further hearing on restitution held on November 5, 2012, the court addressed a claim for direct restitution submitted by Beverly Rhoads based on the loss of services and income formerly provided to her by her murdered son, Joshua. Beverly prepared a spreadsheet classifying Joshua's contributions into those he made on a monthly, quarterly, semiannual and annual basis. The document listed Joshua's monthly contributions of $500 for rent; $300 for groceries; $120 for yard services; $50 for meals out; $60 for meals cooked by Joshua; and $500 for loss of companionship. Also, the document listed a quarterly contribution of $150 for oil/filter changes. Semiannual contributions included $400 for yard cleanup and $375 for gutter cleaning. Annual expenses included $2,550 for major car services/repairs; $450 for garden rototill; and $2,400 for various household maintenance. In sum, Beverly claimed Joshua's total annual contributions to her amounted to $25,910.

---

[2] These restitution orders are not contested on appeal and do not concern us here.

In a letter to the court dated May 23, 2012, and titled, "Explanation of Joshua's Contribution," Beverly stated she had "done my best to outline the economic value my son contributed to me." Beverley's letter to the court also states, Joshua was happy living at home, had no plans to move out, and in particular states, "I believe Joshua would have lived at home for another five years minimum and would have still continued to help me with maintenance on the house for the rest of my life had he been able to be here to do so. He would have never been very far from me. I was a single mom and my son was extremely protective of his mother. He always told me he would always take care of me. We had a very strong bond. The loss is extremely difficult to live with every day. [¶] I broke down the numbers into categories and I now have to pay for all these services. My expenses have increased as I have to pay someone for everything. This is a lifetime hardship I am forced to bear. I submit this breakdown of figures and my explanation to the best I can describe."

In a document entitled "Joshua's Contributions," Beverly provided more information on the line items in the spread sheet. For example, the line item of $2,400 annually for various household maintenance includes "garbage disposal, plumbing, heating and air maintenance, fireplace, lock repair, painting, dump runs, moving, loading and unloading, dryer vent clearing [and other] miscellaneous jobs." Also, the line item of $500 per month for loss of companionship includes, "Gifts and personal [s]ervice [r]unning errands, car rescue example dead battery, flat tire etc. Helped with household cleaning. And was always there for me protecting me. Loss of companionship."

At the restitution hearing, Beverly testified in support of her restitution claim as follows: Joshua was 25 years old when he was murdered in March 2008; Joshua lived in her home all his life with the exception of one year living with his father. Joshua started paying rent when he was 18 years old at the rate of $500 per month. Regarding the $300 per month loss for groceries, Joshua would either give her "cash money extra to help with the groceries or he would go and purchase and cook the meals for me." Regarding the annual loss for vehicle maintenance, Beverly stated, "Joshua worked on cars, and he could take [them] apart and put [them] back together, and he kept my car going and

3

maintained it all the time. So we would go often to the auto parts store and buy all the parts to fix it and keep it going." In addition, she estimated she spent $150 per quarter on oil and filter changes "after he was not there." Further, Beverly works in insurance, drives "all over Northern California for my job" and puts well over 20,000 miles per year on her vehicle. Beverly provided a receipt from Frank's Auto Service in the amount of $488.20 in support of her claim for vehicle expenses and acknowledged "[t]hat's not equivalent to $2,550"; however, she stated that was "one bill I could find," she had paid for other repairs by a friend of Joshua's, but had no "paperwork on that," and has to replace tires and brakes on a regular basis. The sum of $2,550 per year represents her estimate of what she has to spend on maintaining her vehicle after losing Joshua.

Beverly further testified that every week Joshua used to mow the lawn, carry out any "blowing and trimming" required, and make adjustments to the sprinkler system as needed; she now pays $120 a month to Tice Valley Landscape for that service. Also, she has a "lot of foliage" in the yard and the trees and bushes require twice yearly trimming and pruning to "keep things under control." Joshua used to do these semiannual cleanups, which now cost her $400 each. The number of trees around the house mean that the rain gutters on the eaves have to be cleaned out twice a year; Joshua used to do that, but now Beverly pays $375 each time to have the gutters cleaned. Additionally, she has a vegetable garden and every year Joshua rototilled the vegetable garden and helped plant the vegetables; she now pays $450 for this service.

In regard to the sum of $2,400 claimed for annual household maintenance, Beverly explained that "Joshua changed my heating and air conditioning vents or the filters . . . he did everything at the house . . . he put in a new hot water heater. He did everything I needed done there, you know. So without him, I have to pay someone every time to do every single thing now." Beverly testified she often pays for home maintenance jobs in cash, depending "on who's doing the work, . . . so I don't always have receipts for things like that." However, she provided receipts for plumbing ($136.80) and electrical repairs ($996.62 and $560) carried out after Joshua was murdered.

4

Concerning the items for "Meals Out" ($50 per month) and "Cooking For Me" ($60 per month), Beverly testified, "Joshua would always cook, or he cooked for me often because I traveled so much, and I worked really long hours, so I [didn't] get home until late, and so he would prepare dinner lots of times . . . ." Also, Joshua paid when they went out for breakfast a couple of times a month or when they went out for dinner occasionally.

Regarding the item for loss of companionship at $500 per month, Beverley testified that if her car broke down "he would get in—drop what he was doing and come across the bay and fix my car in the middle of the night . . . . What[ever] I needed, my son would do, you know, and so he was my whole world. I don't know what else to say."

At the conclusion of the hearing, and following argument of counsel, the court ruled Beverly had substantiated her claim "through both documentary as well as testimonial evidence," and found "that the amount of $25,910 a year is both reasonable and appropriate . . . by a preponderance of the evidence." Further, the court found "defendant is responsible for the victim's loss over the past . . . four years, eight months, and so the Court is going to grant the request for payment from the date of [the victim's] death until today."[3] Thereafter, the court awarded Beverly restitution in the amount of $120,037.84.

## DISCUSSION

### A. Applicable Legal Principles

The California Constitution provides that crime victims have a right to restitution when they suffer losses as a result of criminal activity. (Cal. Const., art. I, § 28, subd. (b), par. (13) (A) & (B); see *People v. Giordano* (2007) 42 Cal.4th 644, 652 (*Giordano*).) This constitutional mandate is implemented by section 1202.4 (see *Giordano,* at p. 656),

---

[3] The district attorney (DA) asked whether it would be "sufficient for the Court's purpose if I divide 25,910 by 365 and then multiply by the number of days between March 20, 2008, and today?" The court concurred and the DA stated, "when I divide 25,910 by 365 I get 70.9863. I then multiply this between the March 20, 2008, and today, which I calculate to be 1,691 [days], I get $120,037.84." After defense counsel stated she agreed with the calculation, the court ordered restitution in that amount.

which provides in pertinent part: "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim . . . ." (§ 1202.4, subd. (f).) The restitution order "shall be of a dollar amount that is sufficient to fully reimburse the victim . . . for every determined economic loss incurred as the result of the defendant's criminal conduct, . . ." (§ 1202.4, subd. (f)(3).) Further, "[t]he court shall order full restitution unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." (§ 1202.4, subd. (g).)

A trial court's restitution order is reviewed for abuse of discretion. (*Giordano, supra,* 42 Cal.4th at p. 663.) The abuse of discretion standard " '[a]sks in substance whether the ruling in question "falls outside the bounds of reason" under the applicable law and the relevant facts [citations].' [Citation.] Under this standard, while a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the . . . victim's economic loss." (*Id.* at pp. 663–664.) The standard of proof at a restitution hearing is preponderance of the evidence, not proof beyond a reasonable doubt. (See *People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542.) "Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim." (*Id.* at p. 1543.)

### B. Analysis

Preliminarily, we reject defendant's contention the court lacked jurisdiction for its restitution order. Section 1202.46 confers continuing jurisdiction for a court to determine the correct amount of restitution pursuant to section 1202.4, subdivision (f). (See *People v. Bufford* (2007) 146 Cal.App.4th 966, 970.)

Regarding the propriety of the restitution award itself, defendant contends the trial court abused its discretion "in failing to explain its method of calculating the total amount based on various component[s] of the claim." In particular, defendant asserts Beverly's claim did not constitute the "right kind of 'direct' economic loss that is legally

6

compensable" and that her claimed losses are "too speculative" because they lack both "a direct and proximate link" to the crime. We respectfully disagree.

In *Giordano,* our Supreme Court addressed the issue of whether the deceased victim's spouse could recover restitution from the defendant for loss of her dead husband's future earnings. (*Giordano, supra,* 42 Cal.4th at p. 657.) The court first noted "[m]any, if not all, of the categories of loss compensable as direct restitution include losses that are incurred after the occurrence of the crime, and which may continue to be incurred for a substantial period of time following a restitution hearing." (*Id.* at pp. 657–658.) Second, in rejecting the defendant's contention that the victim's spouse "did not personally suffer an economic loss," the court concluded that, as in civil wrongful death actions governed by Code of Civil Procedure section 377.60, the restitution statutes allow a victim to " 'recover compensation for the *economic loss* . . . they suffer as a result of the death,' " including financial support which the victim "would have received from the deceased except for the death." (*Giordano,* at pp. 658–659, original italics.) Third, the court rejected the "defendant's argument that the doctrine of *ejusdem generis* limits the categories of loss that may be compensable by a direct restitution order." (*Id.* at p. 660.) Accordingly, the court concluded "a surviving spouse may receive as direct restitution the amount of lost economic support incurred due to a criminal act that resulted in the death of his or her spouse." (*Id.* at p. 662.)

Here, based on the rationale expounded in *Giordano,* the trial court appropriately awarded direct restitution to a mother in compensation for lost economic support incurred due to defendant's criminal act in murdering her son. With the exception of the award for loss of consortium (see *post*, p. 8*)*, all the items comprising the restitution award constituted economic and financial losses incurred by Beverly because she was deprived of her son's support by defendant's murderous act. Whereas the amounts claimed in economic losses were not all calculated with steely precision, they were all supported by credible testimony and documentation where available, and proven by a preponderance of the evidence. (See *Giordano, supra,* 42 Cal.4th at p. 665 [restitution award "is

committed to the sound discretion of the trial court" and the court's discretion may be guided by "the particular factors at play in each individual claim"].)

Nevertheless, we are troubled by the award for loss of consortium and conclude it cannot stand. On this point, we agree with defendant that loss of consortium does not constitute a compensable economic loss. Direct victim restitution compensates for *economic* losses incurred as a result of the defendant's criminal conduct. (See *People v. Garcia* (2011) 194 Cal.App.4th 612, 617.) A restitution order is not meant to reimburse a crime victim for *noneconomic* losses. (See *People v. Vasquez* (2010) 190 Cal.App.4th 1126, 1132.) "Economic damages are 'objectively verifiable monetary losses including medical expenses, loss of earnings, burial costs, loss of use of property, costs of repair or replacement, costs of obtaining substitute domestic services, loss of employment and loss of business or employment opportunities.' [Citation.] Noneconomic damages are 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, *loss of society and companionship, loss of consortium*, injury to reputation and humiliation.' [Citation]." (*People v. Smith* (2011) 198 Cal.App.4th 415, 431, italics added.) Because loss of consortium is a noneconomic loss, the trial court abused its discretion in including that item in its restitution order. Therefore, the loss of consortium claim must be excluded from Beverly's award of direct restitution. After excluding loss of consortium, Beverly's economic losses amount to $92,240.57.[4]

In all other respects, the trial court's restitution order must be affirmed. The trial court clearly explained its method of calculation. Whereas Beverly claimed loss of support for five years at $25,910, the trial court allowed restitution in an amount reflecting Beverly's loss of economic support from the time of her son's murder to the

---

[4] The trial court based its restitution award on annual economic loss of $25,910. Excluding loss of consortium at $500 per month, Beverly's annual economic loss is reduced to $19,910. Employing the same method as the trial court ($19,910/365 x 1,691 days), in which defense counsel concurred, results in a revised restitution award of $92,240.57.

8

date of the restitution hearing, a period of approximately four years eight months.  The trial court's determination of economic loss was "reasonable, producing a nonarbitrary result," and therefore does not constitute an abuse of discretion.  (*Giordano, supra,* 42 Cal.4th at p. 665; see also *People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045 [no abuse of discretion where there is a "factual and rational basis for the amount of restitution ordered by the trial court"].)

**DISPOSITION**

The trial court's order of direct restitution in favor of Beverly Rhoads is modified to restitution in the amount of $92,240.57.  So modified, the restitution order is affirmed.

_____
Becton, J.*

We concur:

_____
Dondero, Acting P.J.

_____
Banke, J.

---

* Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

9